IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JEDIDIAH MURPHY, | § | |
| *Plaintiff*, | § | |
| | § | No. 1:23-CV-1170-RP-SH |
| | § | (Death Penalty Case) |
| | § | |
| ALEXANDER JONES, et al., | § | Execution Set for |
| *Defendants*. | § | October 10, 2023 |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION
FOR STAY OF EXECUTION WITH BRIEF IN SUPPORT**

Plaintiff Jedidiah Murphy is a Texas death row inmate who is currently scheduled to be executed after 6:00 p.m. (CDT) on October 10, 2023. Plaintiff has filed a civil-rights complaint asserting a denial of his rights under the due process clause of the Sixth Amendment. *See generally* Pl.'s Compl. (Compl.). Defendants have waived service and have not yet answered the complaint. Defendants' deadline for answering will not come until after Plaintiff's scheduled execution. *See* Fed. R. Civ. P. (a)(1)(A)(ii). Plaintiff now moves for a stay of execution so that he can litigate his present civil rights claim. Pl.'s Mot. for Stay (Mot.). For the reasons discussed below, Plaintiff is not entitled to a stay of execution.

**BRIEF STATEMENT OF THE CASE**

Plaintiff does not dispute that he was properly convicted of the capital murder of Bertie Cunningham in 2001:

> After robbing 80-year-old Bertie Cunningham at gunpoint, Jedidiah Isaac Murphy forced her into the trunk of her own car and shot her in the head. He then drove around with her body in the trunk, using her ATM card and credit cards to buy beer and liquor. Murphy was soon

1

arrested. He admitted to the shooting and led police to the creek where he had dumped Cunningham's body. Later at the police station, he wrote and signed a statement claiming that he accidentally shot Cunningham while forcing her into her own trunk.

*Murphy v. Davis*, 901 F.3d 578, 583 (5th Cir. 2018).

At punishment, the State argued that Plaintiff would be a future danger, offering in support evidence that Plaintiff kidnapped Sheryl Wilhelm in August 1997:

> Along with this, the State tried to implicate Murphy in a three-year-old kidnapping case. Sheryl Wilhelm testified for the State that, three years before the Cunningham killing, a man briefly kidnapped her and then stole her car. After seeing a TV news report on Cunningham's murder featuring Murphy's photo, Wilhelm called the police to report Murphy as her kidnapper. She identified Murphy during a pretrial hearing and then again at trial. Wilhelm also testified at trial that she identified Murphy in a police-constructed photo lineup. The detective who conducted the photo lineup testified that Wilhelm's "was one of the better photo" identifications he ever had. According to the detective, Wilhelm said "she was virtually sure that that was the guy who abducted her."
>
> Murphy attacked Wilhelm's identification in a few ways. He called a psychologist who testified that Wilhelm's memory was tainted by the photo of Murphy she saw on the news. The psychologist also pointed out prominent differences between a composite sketch, made just a week after the kidnapping, and the press-released photo of Murphy. And the psychologist added that the photo lineup was unfairly constructed; obvious differences between the mugshots reduced the odds of selection from one-in-six to one-in-three. Murphy also put on an alibi defense. Wilhelm said she had been kidnapped, escaped, and had her car stolen at 11:30 a.m. in Arlington, Texas. The day after her kidnapping, Wilhelm's car was found in Wichita Falls, Texas. In the car, the police found documents belonging to another woman [named Marjorie Ellis]. That woman had been assaulted and had her purse stolen in Wichita Falls at 8:24 p.m. on the day of Wilhelm's kidnapping. Also on the same day, Murphy clocked in for his night shift at 11:54 p.m. in Terrell, Texas. Murphy's counsel argued that Murphy did not have

2

time to kidnap Wilhelm in Arlington, rob the other woman in Wichita Falls, and make it to work in Terrell.

*Id.* at 583–84. The jury found a reasonable probability that Plaintiff would be a future danger.

Plaintiff still maintains that he never committed the Wilhelm kidnapping. In March 24, 2023, Plaintiff moved for touch DNA testing of physical property belonging to Ellis, which was recovered from Wilhelm's car in Wichita Falls the next day. *Murphy v. State*, No. AP-77,112, 2023 WL 6241994, at *5. (Tex. Crim. App. Sep. 26, 2023); *see also* Tex. Code Crim. Proc. art. 64.03 (statute permitting DNA testing). The trial court denied testing on the grounds that Chapter 64 of the Texas Code of Criminal Procedure does not permit testing of evidence that only relates to the punishment phase of trial. *Murphy*, 2023 WL 6241994, at *3. It held alternatively that Plaintiff also failed to meet the requirements of article 64.03 because Plaintiff failed to show "that his motion is not filed for purposes of delaying execution of sentence or the administration of justice." *Id.*; *see also* Tex. Code Crim. Proc. art. 64.03(a)(2)(B). The Texas Court of Criminal Appeals (CCA) affirmed the judgment of the trial court, finding that both grounds for denial were not error. *Murphy*, 2023 WL 6241994, at *3–4.

Plaintiff has now filed a lawsuit under 42 U.S.C. § 1983 claiming that the CCA's interpretation of Chapter 64—that Chapter 64 DNA testing does not extend to punishment-related evidence—violates the Due Process Clause, his right to clemency, his right to access of courts, and his statutory right to counsel under 18 U.S.C. § 3599. *See generally* Compl. Plaintiff now moves for a stay of execution to

3

resolve this pending lawsuit. *See* Mot. Defendant, the district attorney pro tem, opposes.

## ARGUMENT

After two decades of litigation, Plaintiff only moved for DNA testing once the trial court ordered a hearing on the State's motion to set an execution date. The trial court denied the motion for testing, and the CCA affirmed on *two* grounds: (1) Chapter 64 does not permit testing of punishment-related evidence and (2) Plaintiff failed to show his testing motion was not filed for the purpose of unreasonably delaying his sentence. It is undisputed that the merits of this lawsuit could never vitiate the latter ground for denying testing. Thus, Plaintiff will never be afforded the DNA testing he seeks even if his lawsuit is meritorious. Staying execution after two decades to wait on the outcome of an immaterial and purposefully dilatory lawsuit runs counter to the equitable principles at play here.

### I.   Standard of review

"Filing an action that can proceed under § 1983 does not entitle the [plaintiff] to an order staying an execution as a matter of course." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). Rather, a "stay of execution is an equitable remedy and "equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from federal courts." *Id*. When the requested relief is a stay of execution, a court must consider:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will

4

substantially injure the other parties interested in the proceeding; and
(4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *see also Battaglia v. Stephens*, 824 F.3d 470, 473 (5th Cir. 2016) (applying *Nken* factors in context of request for stay of execution).

## II. A Brief Overview of Plaintiff's Lawsuit

Plaintiff argues that Chapter 64 of the Texas Code of Criminal Procedure, which affords court-ordered DNA testing in limited circumstances, violates due process, his right to clemency, his access to courts, and his statutory right to postconviction counsel under 18 U.S.C. § 3599. Complaint at 7–11.

Article 64.03 only affords DNA testing where exculpatory results might undermine confidence in a conviction. Tex. Code Crim. Proc. art. 64.03. The CCA has interpreted this language to mean that "[t]he statute does not authorize testing when exculpatory testing results might affect only the *punishment or sentence* that he received." *Ex parte Gutierrez*, 337 S.W.3d 883, 901 (Tex. Crim. App. 2011) (emphasis added). Moreover, under Texas law, a capital inmate can challenge his sentence through a subsequent application by showing that, but for a constitutional violation, no rational juror would have found a probability that he would be a future danger.[1] Tex. Code Crim. Proc. art. 11.071 §5(a)(3).

Plaintiff argues that this right to challenge his sentence through a subsequent application is violated by the *Gutierrez* rule. He claims that, based on the CCA's

---

[1] Before imposition of a death sentence, a Texas jury is required to find "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Id.* art. 37.071 § 2(b)(1).

5

interpretation that Chapter 64 does not apply to punishment-related evidence, that Chapter is "inadequate to vindicate" his right to meet his burden under § 5(a)(3). Compl. at 10. He also argues that this interpretation of the statute violates his right to clemency, right to access of courts, and right to statutory counsel under § 3599. Compl. at 10–12.

### III. Plaintiff Cannot Make a Strong Showing that He Is Likely to Succeed on the Merits of His Claims.

At the outset, all four grounds presented by Plaintiff lack merit. Turning first to his procedural due process ground, Plaintiff cannot show that the Texas statute on its face violates due process. The Supreme Court recognized a procedural due process right to DNA testing statutes enacted by the states. *District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52, 68 (2009). But the Court has stressed just how narrow this right is: "*Osborne* severely limits the federal action a state prisoner may bring for DNA testing [and] "left slim room for the prisoner to show that the governing state law denies him procedural due process." *Cromartie v. Shealy*, 941 F.3d 1244, 1252 (11th Cir. 2019) (quoting *Skinner v. Switzer*, 562 U.S. 521, 525 (2011)). In fact, "every court of appeals to have applied the *Osborne* test to a state's procedure for postconviction DNA testing has upheld the constitutionality of it." *Id.*

Moreover, Plaintiff raises a facial challenge to the statute. Compl. at 8. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Plaintiff cannot make this showing, as applicants may certainly avail

6

themselves of their rights under § 5(a)(3) without DNA testing.[2] *See Ex parte Blue*, 230 S.W.3d 151, 162-63 (Tex. Crim. App. 2007) (holding § 5(a)(3) does not require clear and convincing evidence *at the threshold* that no rational factfinder would answer at least one of the special issues in the State's favor; instead, only a threshold presentation of facts that, if true, would be sufficient to show innocence of the death penalty is required to be allowed to be proceed to the merits). In fact, Plaintiff is currently doing so in a contemporaneously filed subsequent habeas application challenging his death sentence under § 5(a)(3). *Ex parte Murphy,* No. WR-70,832-05 (Tex. Crim. App.) (filed Sept. 27, 2023). Therein, Plaintiff raises ineffective assistance of trial counsel, false testimony, suppression of exculpatory evidence, and Eighth Amendment claims under § 5(a)(3). Thus, Plaintiff's facial challenge fails.[3]

Plaintiff also argues that denying him DNA testing on punishment-related evidence violates his right to seek executive clemency. Compl. at 10–11. But "pardon and commutation decisions are not traditionally the business of courts." *Faulder v.*

---

[2] In 2021, a sister district court issued a declaratory judgment that Chapter 64 was unconstitutional for the reasons Plaintiff argues here. *Gutierrez v. Saenz*, Civ. No. 1:19-cv-15, 565 F. Supp.3d 892, 911 (S.D. Tex. Mar. 23, 2021). That decision is pending on appeal. *Gutierrez v. Saenz*, No. 21-70009 (5th Cir.). Moreover, the district court's opinion is not binding on this Court.

[3] Plaintiff may not argue that the statute operates unconstitutionally as applied to him, as that would violate the *Rooker/Feldman* doctrine. "That doctrine prohibits federal courts from adjudicating cases brought by state-court losing parties challenging state-court judgments." *Reed v. Goertz*, 598 U.S. 230, 235 (2023) (citing *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983)). For this Court to have original jurisdiction over this matter, Plaintiff must be targeting only the Texas statute, not the CCA's decision itself. *Id.*

*Texas Bd. of Pardons & Paroles*, 178 F.3d 343, 344 (5th Cir. 1999). Thus, while there may be some minimal due process rights afforded such a proceeding, judicial intervention into such a proceeding is exceptionally rare. *See Roach v. Quarterman*, 220 F. App'x 270, 275 (5th Cir. 2007) (denying a certificate of appealability where petitioner failed to provide evidence that he was denied access to the clemency process or that a clemency decision would be made arbitrarily).

Unsurprisingly, Plaintiff cannot point to any case in which the denial of DNA testing violated an inmate's due process right to present a clemency claim. To the contrary other courts have denied similar claims. *Cromartie*, 941 F.3d at 1258 (denying claim that denying an inmate DNA testing restricted his right to present evidence in support of executive clemency); *Noel v. Norris*, 336 F.3d 648, 649 (8th Cir. 2003) (per curiam) (finding that, where the state would not let a capital inmate undergo a brain scan procedure in support of a brain-damage-clemency claim, "we cannot say that the process was so arbitrary as to be unconstitutional or that the state prohibited Mr. Noel from using the procedure that it had established"); *see also Osborne*, 557 U.S. at 74 ("If we extended substantive due process to this area, we would cast these statutes into constitutional doubt and be forced to take over the issue of DNA access ourselves. We are reluctant to enlist the Federal Judiciary in creating a new constitutional code of rules for handling DNA.").

In his third claim, Plaintiff argues the denial of DNA testing denies his "right of access to courts. Compl. at 11–12. But while a state inmate has a "right of access to the courts," that right does not encompass the ability "to *discover* grievances, and

8

to *litigate effectively* once in court." *Lewis v. Casey*, 518 U.S. 343, 350, 354 (1996) (emphasis removed from initial quotation). "One is not entitled to access to the courts merely to argue that there might be some remote possibility of some constitutional violation." *Whitaker v. Collier*, 862 F.3d 490, 501 (5th Cir. 2017) (quoting *Whitaker v. Livingston*, 732 F.3d 465, 467 (5th Cir. 2013)). Thus, Plaintiff's claim that DNA testing *could* allow him to discover a speculative and hypothetical claim in the future necessarily fails to state a claim for relief. *Alvarez v. Attorney General for Fla.*, 679 F.3d 1257, 1265–66 (11th Cir. 2012) (finding access to courts was not violated by denial of postconviction DNA testing). It must therefore be dismissed.

Finally, Plaintiff argues that he has a right under 18 U.S.C. § 3599 for § 3599 counsel to pursue a clemency application and stays of execution. Compl. at 12. He contends that the denial of DNA testing violates that right. *Id*. But several circuits, including this one, "are in uniform agreement that section 3599's authorization for funding does not imply an additional grant of jurisdiction to directly oversee the provision of counsel and related services." *Beatty v. Lumpkin*, 52 F.4th 632, 637 (5th Cir. 2022); *accord Baze v. Parker*, 632 F.3d 338, 342–45 (6th Cir. 2011) (holding that § 3599 did not authorize a federal court to compel third-party compliance with § 3599 counsel's investigators so that they could gather evidence for state clemency proceedings); *Leavitt v. Arave*, 682 F.3d 1138, 1141 (9th Cir. 2012) (denying a request for a federal court to order blood testing under § 3599 for purposes of a clemency

petition). Simply put, § 3599 only authorizes funding; it does not give an inmate any rights to pursue certain claims that would be stymied by the denial of DNA testing.[4]

For these reasons, Plaintiff cannot show a strong likelihood of success on the merits.

## IV. Plaintiff Will Not Suffer Irreparable Harm.

To warrant a stay, Plaintiff must show a "likelihood that irreparable harm will result if that decision is not stayed." *Barefoot v. Estelle*, 463 U.S. 880, 895 (1983). Plaintiff argues that he will suffer irreparable injury because he will not be able to litigate his § 1983 claim. Mot. at 2. But even if Plaintiff wins his lawsuit he will still ultimately be denied DNA testing because the CCA's judgment will stand on the unchallenged ground that Plaintiff's DNA motion was filed for the purpose of delay. Moreover, even if Plaintiff were to obtain DNA results, he would not be able to meet his burden under § 5(a)(3).

### A. Plaintiff cannot show that the relief he seeks would lead to access to DNA testing.

Plaintiff asks for two forms of relief: (1) a declaratory judgment that Texas's interpretation of Chapter 64 as not extending to punishment-related evidence (the *Gutierrez* Rule) and Defendants' enforcement of that interpretation violates

---

[4] And even if § 3599 did create such a procedural right to file certain claims, that right would not extend to a state-court motion for postconviction DNA testing. *See Gary v. Warden, Georgia Diagnostic Prison*, 686 F.3d 1261, 1275 (11th Cir. 2012) (denying funds for DNA expert to assist petitioner in moving the state court for DNA testing because DNA testing is not a subsequent proceeding contemplated by § 3599); *Crutsinger v. Davis*, No. 4:07-cv-00703, 2017 WL 2418635, at *3–4 (N.D. Tex. Jun. 5, 2017) ("The Court concludes . . . that § 3599(a)(2) and (e) do not contemplate the provision of federal counsel in post-petition DNA proceedings.").

procedural due process and (2) injunctive relief enjoining Defendants from opposing requests for DNA testing and declining to produce physical evidence for testing by relying on the *Gutierrez* Rule. Compl. at 13.[5]

As an initial matter, even if this Court issued this type of relief, it is unclear if that would entitle Plaintiff to the DNA testing he seeks. Plaintiff is prevented from obtaining DNA testing related to the Wilhelm/Ellis crimes by the trial court's judgment denying testing, as affirmed by the CCA. *See Reed*, 598 U.S. at 249 (Thomas, J., dissenting) ("[A]ny due process injury that Chapter 64 has caused Reed is traceable to the CCA's judicial application of that law in his case, not to any executive acts or omissions of the district attorney."). If this Court grants Plaintiff his requested relief—declaratory judgment and injunction against the district attorney and Arlington Police Chief—the CCA's judgment affirming the denial of DNA testing "would remain untouched." *Id.* (Thomas, J., dissenting).[6]

---

[5] It is unclear if this Court even has the authority to issue injunctive relief against Defendants to not oppose his request for DNA testing and not decline to produce physical evidence for testing. *See Ramirez v. McCraw*, 715 F. App'x 347, 350 (5th Cir. 2017) (finding the district court "accurately analyzed" the plaintiff's request for "an injunction requiring the defendants to release the biological material on which he asks for DNA testing" as tantamount to an impermissible writ of mandamus); *see also Reed*, 598 U.S. at 249–50 (Thomas, J., dissenting) (noting that the majority fails to explain "what change in conduct would be legally required of" the district attorney if a DNA litigant prevailed in a § 1983 lawsuit).

[6] Obviously, the majority in *Reed* rejected Justice Thomas's argument to the extent that it applied to Article III standing. *Reed*, 598 U.S. at 234. But it still did not articulate just what form actual declaratory and injunctive relief would take where the state-court judgment denying relief remains undisturbed. *See id.* at 249–50 (Thomas, J., dissenting) ("But the district attorney has made clear that he does not understand Reed's requested relief to 'require any change in conduct' from him and that it is not 'likely to bring about such change.' Brief for Respondent 38–39. If the

11

But, even if Plaintiff could somehow disturb the state-court's judgment through his lawsuit,[7] he would still not be entitled to testing. In such an event, the state-court judgment would still stand on a ground independent of the merits of this lawsuit—the CCA's finding that Plaintiff failed to show his motion was not made for the purposes of unreasonable delay. *Murphy*, 2023 WL 6241994, at *5. And for the same reason, even assuming Plaintiff could obtain the relief he seeks—that Defendants not apply the *Gutierrez* Rule to deny him access to DNA testing—Defendants would still be free to apply Chapter 64's unreasonable delay prong against him. Tex. Code Crim. Proc. art. 64.03(a)(1)(B) (requiring movants to show that their request for DNA testing is "not made to unreasonable delay the execution of sentence or administration of justice").

---

majority thinks the district attorney is wrong about that, it would only be fair to explain exactly what change in conduct would be legally required of him if Reed prevailed on his due process claim. The majority fails to do so."). For purposes of showing injury as a *practical* matter, and not just a theoretical exercise, it is unclear how Plaintiff would obtain DNA testing if he prevails.

[7]  It seems beyond dispute that this Court *cannot* disturb the CCA's Chapter 64 judgment, as it has no appellate jurisdiction to do so. *See Reed*, 598 U.S. at 249 (Thomas, J., dissenting) ("Suppose that the District Court accepted Reed's due process arguments and issued his requested relief: an abstract declaration that the interpretation of Chapter 64 that the CCA applied in his case is unconstitutional. How, exactly, would that redress Reed's injury of not having the evidence tested? The CCA's Chapter 64 judgment would remain untouched; Reed would have obtained an opinion disapproving its reasoning, but without any appellate 'revis[ion] and correct[ion]' to disturb its finality."). Rather, Plaintiff's remedy to challenge this judgment would have to be made through a petition for writ of certiorari to the United States Supreme Court. 28 U.S.C. § 1257.

Thus, even if Plaintiff wins this lawsuit, he will not be entitled to DNA testing under state law. Depriving him of such a hollow "victory" cannot be called injury, in any sense.

### B. Plaintiff cannot show DNA testing would show is innocent of the Wilhelm kidnapping.

Plaintiff claims that he is being denied a procedural due process right to meet his subsequent-application burden under § 5(a)(3), which he would prove through his innocence of the Wilhelm kidnapping. Compl. at 9–11. The Fifth Circuit has previously held that, where DNA results would not lead to relief, a pending § 1983 claim attacking a DNA-testing statute is not ground for a stay of execution. *Gutierrez v. Saenz*, 818 F. App'x 309, 312–13 (5th Cir. 2020), *vacated on other grounds by Gutierrez v. Saenz*, 131 S. Ct. 1260, 1261 (2021).[8]

It is unclear what Plaintiff's exculpatory theory is. He obliquely suggests that "biological evidence from the true perpetrator—at a minimum 'touch DNA'—would have been left on the property." Compl at 6. But the presence of another's DNA on the items would not be exculpatory, given the "ubiquity" of touch DNA. *Reed v. State*, 541 S.W.3d 759, 771 (Tex. Crim. App. 2017). DNA from the victims or innocent third parties is just as likely to be present, and Plaintiff offers no rationale with which to distinguish it from any "true" perpetrator. Moreover, Applicant fails to explain how the lack of his touch-DNA being on the property would be exculpatory. Many

---

[8] In *Gutierrez*, the Supreme Court explicitly vacated the order of the Fifth Circuit and remanded for consideration of Gutierrez's spiritual advisor claims, *not* his DNA-testing challenge. *Gutierrez*, 141 S. Ct. at 1261.

perpetrators wear gloves or wipe down items in an effort to avoid detection. The implication of his argument—that if he were the perpetrator his touch DNA must be found on this property—is conclusory.

### C. Plaintiff cannot show that, even if he could disprove that he committed the Wilhelm Kidnapping, he could show he could meet his burden under article § 5(a)(3).

Even if Plaintiff could obtain DNA evidence showing he did not commit the Wilhelm kidnapping, such evidence still would not meet the § 5(a)(3) standard. First, this Circuit has intimated that § 5(a)(3) only permits claims that one is "ineligible for the death penalty" such as those who are intellectually disabled or were under eighteen years old at the time of the capital offense. *Rocha v. Thaler*, 626 F.3d 815, 826–27 (5th Cir. 2010). In *Rocha*, the Fifth Circuit explained that, for this reason, a claim premised on the mitigating evidence the jury did not hear due to trial counsel's ineffectiveness did not amount to a gateway claim under § 5(a)(3). *Id*. Similarly, the future-dangerousness finding is a matter of jury discretion, not categorical eligibility for the death penalty. Tex. Code Crim. Proc. art. 37.071 § 2(b)(1); *see also Lowenfield v. Phelps*, 484 U.S. 231, 245 (1988) (explaining that the future danger special issue allows "the jury to consider the mitigating aspects of the crime and the unique characteristics of the perpetrator, and therefore sufficiently provided for jury discretion."). Thus, a claim premised on attacking an extraneous offense presented in support of the future-dangerousness special issue would not meet the requirements of § 5(a)(3) under this Circuit's precedent, regardless of the existence or nonexistence of DNA evidence.

But even assuming that a claim rebutting an extraneous offense could theoretically meet the requirements of § 5(a)(3), Plaintiff could not do so solely by rebutting the Wilhelm kidnapping. The Fifth Circuit summarized the aggravating evidence against Plaintiff at trial:

> In particular, the severity of Murphy's history of violence was a point of contention. To demonstrate he had such a history, the State submitted Murphy's record of theft convictions. A responding officer also testified for the State about a domestic-abuse call involving Murphy and his girlfriend. The officer said that when he entered Murphy's home, the girlfriend had a bloody nose and Murphy had a knife. The officer subdued Murphy with pepper spray. Another State witness said that Murphy pulled a gun on her at a high school party. He put the gun to her head, asked if she was afraid to die, and held it there for a minute. One of Murphy's coworkers also testified for the State. She claimed that Murphy talked about having access to guns, bragged about shooting people, and threatened to "knock [her] fucking head off." The woman was so frightened that she quit her job and reported Murphy to the police.

*Murphy*, 901 F.3d at 583. Moreover, Applicant's results on the Minnesota Multiphasic Personality Inventory-II (MMPI-2) test, presented in mitigation, revealed aggravating evidence of future danger as well:

> The State proceeded to read off some of the MMPI-2 interpretative report's unfavorable hypotheses, referring to them as Dr. Butcher's "statements." Per the State, Dr. Butcher stated that Murphy exaggerated his symptoms and responded to the last section of the MMPI-2 "either carelessly, randomly, or deceitfully, thereby invalidating that portion of the test." The State continued, reading off that Murphy "has serious problems controlling his impulses and temper," "loses control easily," and may be "assaultive." Murphy, according to the parts read aloud, "manipulates people" and lacks "genuine interpersonal warmth." According to the report, Murphy matches the profile of a Megargee Type H offender, a seriously disturbed

15

> inmate type. Inmates with Murphy's profile will, per the report, "not seek psychological treatment on their own" and are "poor candidates for psychotherapy."

*Id.* at 585. And, of course, Applicant's senseless and callous murder of defenseless eighty-year-old Bertie Cunningham was the most aggravating evidence of all. *Id.* at 583. Under Texas law, the facts of the crime alone can be enough to "support an affirmative finding to the future dangerousness special issue." *Guevara v. State*, 97 S.W.3d 579, 581 (Tex. Crim. App. 2003).

Thus, even if Plaintiff could get DNA testing, and even if that testing rebutted the Wilhelm kidnapping, it would still come up short of showing, by clear and convincing evidence, that *no rational juror* could have ever found a probability that Plaintiff would be a future danger. *See* Tex. Code Crim. Proc. art. 11.071 § 5(a)(3). In resolving a claim related to the Wilhelm kidnapping, the Fifth Circuit suggested that, even if Plaintiff could rebut the Wilhelm kidnapping, he could still not even show a reasonable probability that his sentence would have changed. *See Murphy*, 901 F.3d at 598 ("Finally, as we detailed on Murphy's ineffectiveness claim, the State put on significant other evidence to show Murphy's future dangerousness besides the Wilhelm kidnapping."). It therefore follows that rebutting the offense would fall far short of the much higher standard under § 5(a)(3).

Thus, Plaintiff cannot show (1) that winning his lawsuit will lead to the DNA testing he seeks, (2) that DNA results would be exculpatory, and (3) that exculpatory results would ever permit him to avail himself of Texas's § 5(a)(3) exception to the abuse-of-the-writ bar. Thus, he cannot show injury if his execution is not stayed.

## V. The State and the Public Have a Strong Interest in Seeing the State Court Judgment Carried Out.

The State and crime victims have a "powerful and legitimate interest in punishing the guilty." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (citation omitted). And "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a [death] sentence." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1133 (2019) (quotation omitted); *see Nelson v. Campbell*, 541 U.S. 637, 648 (2004) ("a State retains a significant interest in meting out a sentence of death in a timely fashion"); *Gomez v. United States Dist. Court*, 503 U.S. 653, 654 (1992) (per curiam) ("[e]quity must take into consideration the State's strong interest in proceeding with its judgment"). Once post-conviction proceedings "have run their course . . . finality acquires an added moral dimension. Only with an assurance of real finality can the State execute its moral judgment in a case. Only with real finality can the victims of crime move forward knowing the moral judgment will be carried out." *Calderon*, 523 U.S. at 556.

Here, the public's interest lies in executing sentences duly assessed. For over two decades, Plaintiff has passed through the state and federal collateral review process. The public's interest is not advanced by postponing Plaintiff's execution any further, and the State opposes any action that would cause further delay. *Martel v. Clair*, 565 U.S. 648, 662 (2012) ("Protecting against abusive delay *is* an interest of justice.") (emphasis in original). Two decades after Plaintiff murdered Bertie Cunningham, justice should no longer be denied. *See United States v. Vialva*, 976 F.3d 458, 462 (5th Cir. 2020).

17

Moreover, it is no surprise that "capital petitioners might deliberately engage in dilatory tactics to prolong their incarceration and avoid execution of a sentence of death." *Rhines v. Weber*, 544 U.S. 269, 277–78 (2005). So, also unsurprisingly, "last-minute claims arising from long-known facts, and other 'attempt[s] at manipulation' can provide a sound basis for denying equitable relief in capital cases." *Ramirez v. Collier*, 595 U.S. 411, 434 (2022) (quoting *Gomez*, 503 U.S. at 654). In fact, a "court considering a stay must also apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" *Hill*, 547 U.S. at 584 (quoting *Nelson*, 541 U.S. at 650).

This presumption applies with full force here. Plaintiff has denied the Wilhelm kidnapping since trial. *Murphy*, 901 F.3d at 583–84. Moreover, "Chapter 64, authorizing motions for DNA testing, has been in effect since April 2001." *Murphy*, 2023 WL 6241994, at *5 (citing *Thacker*, 177 S.W.3d 926, 927 (Tex. Crim. App. 2005)). Yet, Plaintiff did not move for DNA testing until March 2023, after the trial court set a hearing on the State's motion to set an execution date. *Id*. And then he did not file his federal lawsuit in this court until September 27, 2023, less than two weeks from his execution. *See generally* Compl.

As such, this lawsuit—belatedly filed less than two weeks before the execution—is precisely the sort of "dilatory tactic" that presumptively weighs against the issuance of a stay.

## CONCLUSION

For these reasons, Plaintiff's request for a stay should be denied.

                                      Respectfully submitted,

                                      KEN PAXTON
                                      Attorney General of Texas

                                      BRENT WEBSTER
                                      First Assistant Attorney General

                                      JOSH RENO
                                      Deputy Attorney General
                                      for Criminal Justice

                                      EDWARD L. MARSHALL
                                      Chief, Criminal Appeals Division

                                      /s/ Ali M. Nasser
                                      ALI M. NASSER*
*Lead Counsel                         Assistant Attorney General
                                      District Attorney Pro tem
                                      State Bar No. 24098169

                                      P. O. Box 12548, Capitol Station
                                      Austin, Texas 78711
                                      (512) 936-1400
                                      (512) 936-1280 (FAX)

                                      ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

      I do herby certify that on October 4, 2023, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court, Western District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" (NEF) to the following counsel of record, who consented in writing to accept the NEF as service of this document by electronic means:

Catherine Clare Bernhard
Law Office of Catherine Clare Bernhard
P.O. Box 506
Seagoville, TX 75159
972-294-7262
Fax: 972-421-1604
Email: cbernhard@sbcglobal.net

Katherine Froyen Black
Attorney At Law
205 Blue Ridge Trail
Austin, TX 78746
415-847-6127
Email: kfroyen@gmail.com

Russell David Hunt, Jr.
Russell D. Hunt, Jr. Attorney at Law
310 South Austin Avenue
Georgetown, TX 78626
(512)474-5114
Fax: (512)857-0746
Email: admin@russhuntjrlaw.com

Joshua Neal Humphreys
City of Arlington, City Attorney's Office
101 South Mesquite Street, Suite 300
Arlington, TX 76010
512-799-2918
Email: josh.humphreys@arlingtontx.gov

                                              /s/ Ali M. Nasser
                                              ALI M. NASSER
                                              District Attorney Pro Tem
                                              Assistant Attorney General